The plaintiffs were duly appointed and qualified as administrators of the estate of Leon H. Chestnut and sued the defendant corporations jointly.
A nonsuit was entered at the close of plaintiffs' evidence as to the Carolina Power Light Company, no appeal was taken, and it is not necessary to consider its defenses. *Page 383 
Plaintiffs allege: That on 13 November, 1924, and for more than a year prior thereto, the plaintiffs' intestate was employed by the defendants as a carpenter, at Phoenix, Chatham County, North Carolina, at which place the defendants were erecting a "steam plant" to be used by the defendant, the Carolina Power Light Company, for manufacturing or generating electricity; and that on the said 13 November, 1924, plaintiffs' said intestate, at the direction of and instructions from one of his foremen, climbed into the roof of one of the buildings some 20 feet high, and located at said plant, for the purpose of making some repair on said building, and he was directed to go out upon a small steel beam for such purpose, said beam being some 15 feet from the floor; that in the roof of said building and over the said beam, and just where the plaintiffs' intestate was required to do the work, the defendant Carolina Power Light Company had placed several lines of wire used for the transmission of electricity; that over such lines electricity of high voltage, which is a dangerous and life-destroying force, was transmitted, and in order to protect the plaintiffs' intestate and furnish him a safe place in which to work, it was necessary for and was the duty of the defendants to cut off the said current, so that said wires should not be charged with electricity while he was in said roof engaged in making the said repairs and performing such other duties as he had been directed to perform; that while the plaintiffs' intestate was in said roof upon said steel beam, as aforesaid, endeavoring to perform the duties as directed, the defendants negligently, carelessly, wrongfully, and in utter disregard of its duty to plaintiffs' intestate, permitted a dangerous, excessive and highly charged current of electricity to pass through or over said lines, and while attempting to perform his duties incident to making some repairs, the plaintiffs' intestate unavoidably came in contact with one of the wires charged as aforesaid, and was immediately and instantaneously electrocuted, and fell to the ground, dead. That the negligence of the defendants in failing to cut off said current and their failure to furnish the plaintiffs' intestate a safe place in which to work was the proximate cause of his death. That as result of the negligence of the defendants as above alleged, the plaintiffs' intestate has been endamaged, etc.
The Phoenix Utility Company admits it is a corporation and that Leon H. Chestnut was in its employ on 13 November, 1924, but denies all the other allegations of plaintiffs' complaint. For a further defense it sets up:
(1) That it has no knowledge or information to form a belief as to what caused the death of Chestnut and denies it was caused by electrocution; that it was engaged in construction work and owned no interest in any electric wires. *Page 384 
(2) It sets up the plea of contributory negligence: It was not necessary for plaintiffs' intestate to have gone under the shelter or near the wires described in the complaint, and if he did so, as alleged in the complaint, and did so not of necessity or on account of any order of any foreman of this defendant, but voluntarily; that the place at which the plaintiffs' intestate was required to work, and should have worked on the top of the roof and at a distance from the said wires was perfectly safe and free from all of the dangers which are alleged in the complaint to have caused his injury and death, and that it was the duty of the plaintiffs' intestate to have remained in said place and to have finished his work there, and the plaintiffs' intestate in going under the shelter and coming in contact with the wires, as alleged in the complaint, if he did come in contact therewith, which the defendant denies, contributed by his own negligence to his injury and death, and his said contributory negligence was the proximate cause thereof; and this defendant pleads said contributory negligence in bar of the plaintiffs' recovery herein.
(3) That plaintiffs' intestate was experienced and accustomed to work in and about wires, knew the danger, knew, or ought to have known, that the wires were charged and should have had same cut off before working in close proximity. That he had served long in and about electrical wires — knew the dangers and that he negligently and carelessly took hold of the wires, if he was killed by the electric current, and this negligence on his part was the proximate cause of his death. That plaintiffs' intestate well knew that the place into which he voluntarily went without any order of his superior or foreman was a dangerous and unsafe place in which to work, and in voluntarily climbing and working in and near the wires alleged to be charged with electric current, the plaintiffs' intestate assumed the risk incident thereto, and this defendant is not chargeable therewith; and the defendant pleads said assumption of risk in bar of the plaintiffs' recovery herein.
The issues submitted to the jury and their answers thereto, were as follows:
"1. Was the plaintiffs' intestate killed, by the negligence of the defendant, the Phoenix Utility Company, as alleged in the complaint? Answer: Yes.
"2. Did the plaintiffs' intestate, Chestnut, by his own negligence, contribute to the injury resulting in his death, as alleged in the answer? Answer: No.
"3. Did the plaintiffs' intestate, Chestnut, voluntarily assume the risk of receiving the injury resulting in his death, as alleged in the answer? Answer: No. *Page 385 
"4. What damages, if any, are the plaintiffs entitled to recover of the defendant, the Phoenix Utility Company? Answer: $6,500.00."
Judgment was rendered on the verdict. Many exceptions and assignments of error were made by defendant and appeal taken to the Supreme Court. The material ones, and relevant facts, will be considered in the opinion.
The real and material assignment of error by defendant "For that the court denied the defendants' motion for judgment as of nonsuit at the close of plaintiffs' evidence." The defendant introduced no evidence.
"On a motion to nonsuit, the evidence is to be taken in the light most favorable to plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom. Christman v. Hilliard, 167 N.C. 6; Oil Co. v. Hunt,187 N.C. 157; Hanes v. Utilities Co., 188 N.C. 465; Hancock v.Southgate, 186 N.C. 282." Lindsey v. Lumber Co., 189 N.C. 119; Nash v.Royster, 189 N.C. 408; Baltimore O. R. R. Co. v. Groeger, U.S. Sup. Court (filed 5 January, 1925.)
The facts: Leon H. Chestnut was a carpenter and had been working for about two years for defendant, Phoenix Utility Company. This company was constructing a steam plant for the Carolina Power Company, which was subsequently turned over to the Carolina Power Light Company. The construction work was going on for several years. The intake building at the river is built of steel framework — there are no sides on the building. It is covered on the top, the sides come down two or three feet. The roof of the building is about 18 feet from the level of the floor to where the little weather-boarding comes and about 2 1/2 or 3 feet from the roof down to the level of the weather-boarding. The trolley wires are up under the side of the weather-boarding. Three small bare copper wires, one setting over the other 4 to 6 inches apart and about 15 to 20 inches from the wall or side, ran from one end of the building to the other. The wires are used for the current to go to the motor that pulls the gates up. The gates are 16 to 18 feet long and 8 feet wide, they were steel frame with screens fitted in and are used to keep trash, etc., from coming in where the water goes to the plant, and are near where the wires are in the intake building. A person could move around safely under the intake building to clinch the nail if there was no juice — electricity — in the wires. It was not a dangerous place. Chestnut had to go up between the wires and the weather-boarding *Page 386 
to get to the nail that he was going to clinch. There was about 18 or 20 inches of space between the weather-boarding and these wires. A person who walks around has the wall to hold to. The trolley wires were naked, not covered or insulated. It was the custom to put the current on the wires to give power to pull the gates up. The motor was being used the evening before the death of Chestnut, the juice or current was on the trolley wires, two gates were pulled up. The wires ran from the boiler room about 50 yards to the intake building. The current could be disconnected by two switches. The switch-house, or cut-off, was at the intake shed and boiler room. The room to the intake shed was completed but was hit by a crane or derrick. The juice, or electricity, was turned on the evening before to lift the gates to make repairs. Nobody had been notified to cut off the current. Chestnut fell straight under the wires. The voltage of electricity that the wires carried was approximately 550 volts. W. L. Hipps, working for Phoenix Utility Company turned on the juice. The capacity of the plant is 30,000 kilowatts or 40,000 horsepower. Shortly after Chestnut fell the switch in the switchhouse at the intake shed was found to be coupled or connected up with the juice or electric current. With the roof torn up or wrecked by the derrick or crane, Chestnut, who was working with Riddle, was sent to repair the wreck — "to fix it the best we could," was the order of the foreman, Charles Marks, of Phoenix Utility Company.
T. N. Riddle, said "Mr. Chestnut and I were repairing the roof that day. We went up there to repair the roof; `to fix it the best we could,' because we were told to by Charles Marks, our foreman. He was the foreman of Mr. Chestnut and me. The roof was wrecked by the crane and we were sort of straightening it back. It is a tin roof, sheet tin. We could have fixed it from the top if we had had sufficient bolts, but we didn't have them. Mr. Marks fixed us a piece of steel in order to hold the tin together while we were bolting it. We were bolting it to hold it together in shape. We didn't finish it; we got out of bolts and Mr. Chestnut said it would be all right if we clinched it with a nail anyhow, he thought; and I said all right, I thought it would too. Mr. Chestnut did not clinch the nail, but he went to clinch it. We had a ladder to go up there, and he went down the ladder and under that little — I don't know what you call it — anyhow, the sheet down about 2 or 3 feet, dropped down below that, under it, under there. I don't know how high he got up, but he got far enough to ask me where about the nail was. He was going under the roof to pin it down, I guess, so it would hold this covering together, to clinch the nail. He was clinching the nail to hold the roof down. After Mr. Chestnut got under there he asked me where the nail was, and I shook the tin roof so he would know where; I asked him if he saw that, and he never answered it. *Page 387 
The next time I saw him he was down on the room floor. He was killed. I did not know at that time whether there was any exposed live wires under the roof where Mr. Chestnut went or not. I have found out since that there are three wires under the roof which are used in raising the gates at the intake."
Dr. J. E. Cathell, and others, testified to scars on Chestnut's left hand shortly after the injury, and Chestnut's wife testified that he had no scar on his left hand — (prior) — a reasonable inference he was burned by the live wires.
It is the duty of the master, in the exercise of ordinary or reasonable care, to furnish or provide his servant a reasonably safe and suitable place in which to work. This duty is primary and nondelegable. Cable v.Lumber Co., 189 N.C. p. 840; Riggs v. Mfg. Co., ante, 256; Paderick v.Lumber Co., ante, 308.
In the case here, it is contended by the defendant, Phoenix Utility Company, that this was done and the plaintiffs' intestate went beyond the safety zone and was killed. If he had not gone under the roof of the intake building, he would not have come in contact with the live wires. That the roof was safe, that he dropped the tap and should have gone after it. That he had a safe and suitable place in which to do his work and he left the safe place where he was assigned to work.
On the other hand, it is contended by the plaintiffs that the master, through his alter ego, the foreman, Charles Marks, in sending Chestnut and his fellow workman to repair the roof, gave him bolts and taps, but went further and committed to him the discretion "to fix it the best we could," and the safety zone included the place where the live wires were, with no notice to Chestnut that the juice or current was on. That the crane or derrick had ripped the tin up and in fixing it back, that when the bolts were all put in and the last could not be tightened, as the tap had dropped, it was only necessary to hold down a part of the tin, the balance had been fixed, and a large nail in the tin was ample to do this and it was nailed through, but to hold it tight it was necessary to clinch the nail and Chestnut had go under the shed to do this and was electrocuted. That under all the facts and circumstances, Chestnut acted in the scope of the authority given him by the foreman. The utility company did not have the trolley wires covered or insulated, and the voltage of electricity or juice in the electric wires was deadly; and the utility company did not, in the exercise of reasonable care, provide Chestnut with a safe and suitable place or zone to do his work, and the failure was the proximate cause of Chestnut being killed.
It is well settled that where a servant departs from the sphere of his assigned duty, the relation of master and servant is temporarily suspended. *Page 388 
The act must be performed in the line of duty and within the scope of the authority conferred by the master, either express, implied or apparent.Mason v. R. R., 114 N.C. 718; Rittenhouse v. R. R., 120 N.C. 547;Whitson v. Wrenn, 134 N.C. 86; Patterson v. Lumber Co., 145 N.C. 42;Burnett v. Mills Co., 152 N.C. 35; Horne v. R. R., 170 N.C. 659; Hortonv. R. R., 175 N.C. 487.
We think the principle above enunciated and contended for by defendant, as to the liability of master and servant, correct. But we think here that the defendant's contention is too restricted from the alter ego authority to plaintiffs' intestate "to fix it the best we could." The tin roof ripped up by the crane or derrick had to be fastened down, bolts were used, a tap of one was dropped by Chestnut — a nail would answer already nailed through but had to be clinched. The faithful servant, to perform the duty of fastening down the tin, which he was sent to do, went under the roof to clinch the nail, came in contact with live wires unprotected and naked, and was electrocuted. Defendant called the place, in its further answer, a "shelter" — it proved to be a death-trap.
4 Labatt's Master and Servant (2d ed.), part sec. 1565, p. 4721 says: "If an employee quits the work assigned to him by his employer, and voluntarily undertakes to do work about which he had no duties to perform by virtue of the contractual relation existing between him and his employer, then, while such condition exists, the duty growing out of that relation of using care for his safety does not rest upon the employer. In other words, a servant who voluntarily and without directions from the master, and without his acquiescence, goes into hazardous work which is not embraced in the contract of hiring, may be regarded as putting himself beyond the protection of his master's implied undertaking. ". . . Part sec. 1566, says: "The scope of a servant's duties in relation to the rule illustrated by the cases cited in the last section is defined by what he was employed to perform, and by what, with the knowledge and approval of his employer, he actually did perform, rather than by the mere verbal designation of his position. The question whether the injured person was acting in the course of his employment is for the jury, where the evidence is conflicting, or where a difference of opinion may reasonably be entertained with regard to the proper inference to be drawn from the testimony. Otherwise that question is decided as one of law by the court."
In 8 Thompson's Commentaries on the Law of Negligence (White's Supplement), sec. 5335, it is stated: "The servant has the right to assume that his master has performed his duties, and he may rely on the performance of the duty not to create a dangerous condition without warning. The employee likewise has the right to assume that his employer will conduct his business with reasonable regard to rules *Page 389 
laid down by such employer. The servant without knowledge of a defect in appliances furnished by the master may act on the assumption that these appliances are reasonably safe. Similarly he may rely on the performance of the duty of his master to make the place of work reasonably safe, and he is not required to make an examination to ascertain whether his duty has been performed. The employee may, ordinarily, rely on the assurance of safety given him by his supervisors, but this does not relieve him from the duty to exercise care to avoid known and obvious dangers. The servant may, ordinarily assume that the employers will properly discharge their duty."Thomas v. Lawrence, 189 N.C. 521; Walker v. R. R., 135 N.C. 738.
Without pursuing the subject further and without considering the assignments of error seriatim, from the view we take of the case, we think the court below was correct in refusing defendants' motion for judgment as of nonsuit, and in refusing the prayers for instruction as asked for. In the instructions of the court below on the issues, we can discover no prejudicial or reversible error.
No error.